Moses *v.* Wallace.

7L 413
8L 67
11L 197
13L 293

7L 413
116 67

# JOHN L. MOSES *v.* CAMPBELL WALLACE.

1. LAND. *Sale in gross.* . Where land is sold in gross, not by the acre, without any stipulation as to quantity, and the boundaries are correctly given in the contract, the purchaser takes the risk as to quantity, and, in the absence of fraud or of a deficiency so great as to create a presumption of fraud, cannot claim a deduction in the purchase price for any deficiency in quantity, but he may have an abatement of the purchase price for a failure of title to a part of the land actually included in the boundaries given in the contract, unless, indeed, the tract of land sold is clearly defined by natural or artificial boundaries, and it is shown that the vendor intended to sell and the vendee to buy the land as defined by these bounds, not by the calls of the contract, and the vendee received what he bargained for. The burden of proof is on the vendor to make a case falling within the exception, and he has failed in this case.

2. SAME. *Sale. Failure of title.* ` Damages.` Upon a partial failure of title, the vendee may elect to retain the land so far as the title is good, and have an abatement of the purchase price to the extent of the value of the land lost, the abatement to be estimated in the relative proportion of the value of the land lost to the value of the whole land at the contract price.

## FROM KNOX.

Appeal from the Chancery Court at Knoxville. W. B. STALEY, Ch.

HENDERSON & JOUROLMON for complainant.

WM. M. BAXTER for defendant.

COOPER, J., delivered the opinion of the court.

On the 6th of February, 1863, the defendant Wallace sold to the complainant Moses a small tract of

land near to the city of Knoxville for $5,000, secured by the purchaser's notes in equal instalments at one, two, three, four and five years, with interest from date, payable in "bankable funds." On the same day, Wallace executed his bond in double that sum, conditioned to make Moses a good title in fee simple to the land, with covenants of general warranty, "upon the payment of all of the notes with the interest that may accrue thereon, and especially the one last falling due." The tract of land sold is described in the title bond as containing forty-three and three-fourths acres more or less, "being my entire remainder of the tract purchased by me on the first day of September, 1851, at a public sale made by Gordon Mynatt, administrator of the estate of John Hillsman, deceased, confirmed by a decree of the chancery court at Knoxville, bearing date April 5, 1853, which tract is designated as adjoining the lands of C. H. Coffin, John L. Moses and others, beginning," etc., giving metes and bounds. The condition of the bond was to convey "the tract hereinbefore described, with the exception of ten acres" and two lots theretofore conveyed to certain persons named.

The first three of the purchase notes and the greater part of the fourth note were paid in 1864 with Confederate treasury notes at a discount of a little over twenty-five per cent. The residue of the fourth note and part of the fifth note were paid after maturity in legal tender currency. Suit having been brought at law upon the last note, this bill was filed on February 5, 1875, to enjoin its prosecution, upon the ground

that complainant was entitled to have the purchase money scaled to the value of the Confederate treasury notes, for an account of payments, and for compensation for the failure of title to three or four acres of land included in the metes and bounds of the title bond. An answer was filed and proof taken, as a part of which it was agreed by the parties that three and a half acres of land were included in the boundaries of the title bond to which defendant had no title. The balance of purchase money due the defendant was, upon reference, ascertained by the clerk, to whose report on this point no exception was taken. Upon the final hearing, the chancellor held that the words "bankable funds," used in the notes given for the purchase money, meant such funds as were bankable at the maturity of the notes, and therefore refused to scale the debt. He was of opinion, however, that the complainant was entitled to a deduction for the value at the date of his decree of the three and a half acres to which defendant had no title, and rendered a decree accordingly. The defendant appealed.

The correctness of the chancellor's construction of the language of the purchase notes has not been seriously called in question. The evidence does not show that Confederate treasury bills were bankable funds at the time when the trade was made, and the complainant concedes in his testimony that there was no positive agreement that they should be received in payment of his notes. The decree of the chancellor is sought to be impeached by the appellant, first, in allowing any deduction on account of the failure of title to the

three and a half acres, and, secondly, if this point is decided in favor of the complainant, in the measure of damages adopted.

The land to which the title fails lies in one corner of the tract sold. The sale was of the whole tract in gross, not by the acre. The defendant admits that there was a difficulty about the boundary lines at that corner, but says that complainant also knew about it, and that neither considered it of any importance. The complainant admits that he knew the land in a general way, as he did the lands of others of his neighbors, and that he had known it from the year 1849, when he bought the adjoining tract. He denies, however, that he knew about the defect of title until long after the purchase. He drew the title bond, and cannot remember how he obtained the calls of the land as written therein, but thinks it was probably from papers furnished by the defendant. The bill states, and one of the witnesses proves that the fraction of land in controversy " is partly enclosed " by the claimant of the better title, but it does not appear that the enclosure existed at the time of sale. Upon these facts, and the long delay of the complainant in the assertion of his rights, it is earnestly argued that no relief can be granted for the admitted deficiency.

It is well settled in this State that where land is sold in gross, not by the acre, without any stipulation as to quantity, and the boundaries are correctly given, the purchaser takes the risk as to quantity, and, in the absence of fraud, no deduction will be made in the price for a deficiency in quantity, unless the defi-

Moses *v.* Wallace.

ciency is so great as to create the presumption of fraud: *Miller* v. *Bentley*, 5 Sneed, 671. On the other hand, it is equally well settled that, even where the sale is in gross, the vendee may in equity have an abatement of the purchase price for a defect of title to a part of the land actually included in the title bond: *Collins* v. *Smith*, 1 Head, 252. There are cases, intermediate between these two extremes, where it has been held that, although there was a failure of title as to a part of the land embraced in the boundaries of the title bond or contract of sale, and the sale was in gross, yet the vendee could not claim in equity an abatement of the purchase price, upon the ground that he knew exactly what he was purchasing, and got all that he bargained for: *Meek* v. *Bearden*, 5 Yer., 467; *Blakemore* v. *Kimmons*, 8 Baxt., 470. " No one," says the opinion in the first of these cases, "who has the precise thing expected and intended to be purchased can have, in a court of equity, an abatement in the price."

The general rule, in equity as at law, undoubtedly is that a party has a right to stand upon his contract, and claim the benefit of all that it gives. It is only in rare and extreme cases, where the tract of land is clearly defined by natural or artificial boundaries, and well known to the purchaser, who actually receives all that he intended to buy and the vendor intended to sell, and by some error in the calls of the contract the boundaries include land belonging to third persons, that equity will refuse to follow the letter of the contract, and execute it according to its

spirit. In such cases, the court acts upon its favorite maxim of compelling him who comes into equity for relief to do equity. In the case before us, the de· fendant virtually concedes that the parcel of land in controversy was intended to be included in the calls of the title bond, although there was some difficulty in regard to it, and he fails to show that the complainant knew the facts, and bought only the residue of the land. The burden of proof was upon the defendant, and he has not brought his case within the exception to the general rule.

The decree below, in its estimate of the value of the land as to which there is a failure of title, proceeds upon the assumption that the bill is, in substance, an action upon the title bond to recover damages for the failure to convey. In such an action, it has been held in this State that the measure of damages is the value of the land at the time of the breach, with or without interest as the jury may determine, and that the date of the breach is when the purchase money is paid, or tendered and refused, the bond being like the one before us: *Hopkins* v. *Yowell*, 5 Yer., 305; *Shaw* v. *Wilkins*, 8 Hum., 647. It has, however, been also held that where the agreement is that the title shall be made when the purchase money is fully paid, the covenant to convey is dependent upon the condition, whether treated as precedent or concurrent, that there has been a payment of the purchase money in full, or its equivalent a tender and refusal. Unless, therefore, the vendee can aver a performance of the condition, or its equivalent, he fails to put the vendor

in default, and has no right of action for a breach of the contract: *Clark* v. *Locke*, 11 Hum., 300. An election to sue upon the bond would, moreover, turn the instrument into a chose in action, its strict legal effect at common law, and the breach would be the failure to convey the whole tract as an entirety: *Wilkins* v. *Frierson*, 2 Sneed, 701. But the object of this bill is not a recovery of entire damages for the whole tract, nor is there any averment of "the payment of all the notes, with the interest that may accrue thereon, and especially the one last falling due." No such averment was possible at the commencement of this suit, for the complainant was resisting the payment of the last note. The object of the bill, plainly expresed, was to have the contract specifically executed so far as the defendant had title, and for compensation for the deficiency. The rule of equity, well settled in this State, is that, where there is a partial failure of title, the vendee may elect to retain the land so far as the title is good, and have an abatement of the purchase price to the extent of the value of land lost. But it has been uniformly held, in such case, that the abatement is to be estimated in the relative proportion of the value of the land lost to the value of the whole land at the agreed price, with interest: *Collins* v. *Smith*, 1 Head, 252; *Mullins* v. *Aiken*, 2 Heis., 535; *Frazier* v. *Tubb*, 2 Heis., 669; *Topp* v. *White*, 12 Heis., 181. That proportion in this case, as admitted by the complainant in his earliest and most reliable deposition, would be at the rate of $100 per acre.

E. Tenn. National Bank *v.* First Nat. Bank.

The chancellor's decree will be modified accordingly. The complainant will pay the costs of this court, the costs below to be paid as directed by that court.