IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 27, 2017 Session

## DANIEL D. HALL ET AL. v. EAGLE ROCK DEVELOPMENT, LLC ET AL.

Appeal from the Chancery Court for Sevier County
No. 1212526          Telford E. Forgety, Jr., Chancellor

_____

### No. E2015-01487-COA-R3-CV
_____

This case involves misrepresentations allegedly made to a husband and wife, purchasers of real estate. On June 16, 2006, Daniel D. Hall and Julie K. Hall executed a contract to purchase lot 25 in the Preserve at English Mountain (the Preserve). On June 30, 2006, the transaction closed. In November 2009, the Halls learned, for the first time, that public sewage disposal was not available to lot 25. Because of this deficiency, the Halls were restricted, against their wishes, to a dwelling with only two bedrooms. On December 14, 2012, based upon the misrepresentation that lot 25 would have access to public sewage disposal, the Halls filed a complaint against various entities and individuals involved in the sale. Refusing to pierce the corporate veil as to individual defendants Phillip Joseph and Daniel L. Barnett, the trial court dismissed all of the individual defendants and some of the other defendants. The court found material misrepresentations and granted the Halls rescission of the purchase contract and a refund of $123,000. In addition, the court awarded the Halls attorney's fees under the Tennessee Consumer Protection Act (TCPA) against Blue Ridge Realty, Inc. (Blue Ridge) predicated upon the failure of the Halls' agent to disclose that he was a member of the entity selling the property. Eagle Rock Development, LLC (Eagle Rock) and Blue Ridge (collectively the entity defendants) appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II and W. NEAL MCBRAYER, JJ., joined.

David E. Fielder, Knoxville, Tennessee, for the appellants, Eagle Rock Development, LLC and Blue Ridge Realty, Inc..

Douglas E. Taylor, Seymour, Tennessee, for the appellees, Daniel D. Hall and Julie K. Hall.

## OPINION

### I.

In June 2006, the Halls learned about the Preserve from Ramona Knorr, the principal broker for Realty Executives Lakeside, the exclusive listing agency for the Preserve. In early June 2006, Mr. Hall visited the development with Ms. Knorr present. It is disputed as to whether Ms. Knorr made representations to Mr. Hall regarding public sewer service to the property during their time together. At trial, Mr. Hall testified as follows:

> [Ms. Knorr] said that they were going to have city public water and sewer from the bottom to the top, which I found interesting because it wouldn't limit the number of bedrooms that I would have, and I thought that was an important component to the property.
>
> *        *        *
>
> [F]rom my viewpoint, utilities had the stubs and everything. If you're walking around the first phase, you had . . . water meter, you had a sewer cover, said sewer on it.

In her deposition, Ms. Knorr's testimony differed from Mr. Hall: she said that they did not discuss anything related to utilities or sewer. She stated that she did not recall giving any specifics to Mr. Hall but that there was a website with the master information about the development.

At the time Mr. Hall viewed his lot, the Multiple Listing Service (MLS) brief for lot 25 reflected that the property had sewer. Furthermore, the development's declaration of guidelines available on its website provided the following:

> 2.6 *Utilities*
>
> Utility services are stubbed to the front property line of each homesite. Sewer, gas (if applicable), electricity, and telecommunications service locations are clustered (usually with those of one adjacent homesite) in a utility easement located adjacent to each homesite. The extension of services

from these stub locations to the residence shall be the responsibility of each Owner . . . .

(Italics in original.) It is undisputed that sewer manholes existed in front of the lots at the time Mr. Hall visited the property.

On June 8, 2006, the Sevier County Division of Environmental Health issued a Certification of Subsurface Disposal to the Preserve. The certification approved lot 25 but only for "standard *individual subsurface sewage deposit system* serving a maximum of two bedrooms." (Emphasis added.) Mr. Hall was not provided with, this certification prior to closing on lot 25 and was otherwise unaware of it.

As previously noted in this opinion, on June 16, 2006, the Halls signed the contract to purchase lot 25. On the same date, the Halls also signed a disclosure statement drafted by the seller. On this document, under utilities, the seller marked "no" to indicate that there was no public sewer. Also on June 16, 2006, the Halls signed a "Confirmation of Agency Status" expressly stating that Philip Joseph was their agent in the transaction. Significantly, Mr. Joseph signed on the line in the document for the signature of the seller. On June 30, 2006, the Halls closed on lot 25.

Having bought the property for investment purposes, the Halls immediately listed the property for sale. After listing the property with several agents, the Halls eventually contacted Steven Maness regarding the listing of lot 25. In November 2009, prior to listing the property with him, Mr. Maness presented the Halls with the subsurface sewage letter restricting the lot to a maximum of two bedrooms. Because they thought the lot had public sewer and assert that they had never been told that the lot is limited to a two-bedroom septic tank, the Halls did not relist the property.

Claiming that it had been represented to them that the lot would have public sewer and that they had never been told that the lot was "coded" for a two-bedroom septic tank, the Halls filed a complaint for breach of contract. In their complaint, the Halls assert the following:

> At all times material to the issues joined herein, the Defendants represented that the subject property would have city sewer service provided for development . . . as part of the underground utilities package serving the entire development from top to bottom, including the property at issue herein. . . . The Defendants represented, that while not yet constructed, sewer service would be constructed as the development infrastructure was completed and for the entire development from top to bottom. [They] were never provided with any documentation of the results of any subsurface sewage

- 3 -

evaluation results, but were always led to believe that construction of sewer for the development was guaranteed and in the process of being implemented.

Prior to execution of the Contract, the Defendants represented the sewer service as being available from the lots located at the bottom of the development to the lots located at the top of the development, which was represented to be an important component of the value of the development . . . as there would not be a limit to the number of bedrooms allowed for the homes built there, resulting in the construction of sizeable estates, making the purchase of the subject land a valuable investment. . . .

Prior to execution of the Contract, the Defendants presented [them] with the MLS brief and other advertising which represented the subject development would have city sewer, and encouraged to visit the development's website which also represented that each home site had city sewer.

*     *     *

The Defendant, Barnett, signed as or on behalf of the seller on the Contract and Settlement Statement, while the Defendant, Joseph, signed the Disclosure Statement as or on behalf of the seller, as well as the Confirmation of Agency Status, signing the same Confirmation of Agency Status as the "Seller," "Selling Licensee" on behalf of the Defendant, Blue Ridge Realty, and also as "Designated Agent for the Buyer," at a later date just before closing. Such constitutes a conflict of interest and violation of fiduciary duty, and demonstrates a conspiracy to defraud the Plaintiffs.

*     *     *

The Defendants engaged in deceptive acts and practices, made material representations regarding the development, which acts and practices were likely to mislead a reasonable consumer . . . to their detriment. The Defendants had a duty to disclose to [them] material facts that affect the property's value and that were not known or reasonably discoverable by [them] exercising ordinary diligence. . . .

- 4 -

(Paragraph numbering and citations to exhibits in original omitted.)

Refusing to pierce the corporate veil, the trial court dismissed all defendants with the exception of the entity defendants. In its ruling, the trial court stated the following with regard to representations made to the Halls:

> The Court holds by a preponderance of the evidence, while it is disputed, but the Court holds by the preponderance of the evidence that there were material misrepresentations that were made to the Halls in connection with the purchase of the lot. . . . Dan Hall testifies that Ms. Knorr told me, specifically told me that the utilities, including sewer, that the sewer was existing on the ground; I could hook up to it and I could use it. Again, that's disputed. However, I find that the preponderance of the evidence is that those representations were made to him. I find that for a number of reasons. There are other things in the record, specifically the . . . design guidelines which were published on the Internet. . . . Those were published long prior to the time that the Halls bought their lot [and] speak affirmatively in the present tense. Say utility services are stubbed in. Beyond that it's undisputed that when Mr. Hall looked at lot 25 there was a sewer manhole existing in front of a lot. . . . [H]aving a sewer manhole existing in front of a lot that you're looking at, taken together with design guidelines that say utility services are stubbed in amounts to a representation that in fact they are just what the guidelines said they are; that is that they are stubbed in. . . .
>
> *       *       *
>
> [A newspaper article] posted between the signing and closing . . . says, again, water and sewer service are being provided by the development's own water treatment plant. Speaking in the present tense as if it's already there when it certainly was not already there on June 23.
>
> And then we have multiple, multiple MLS listing reports for lots, including lot number 25 owned by the Halls, that . . . represented . . . that these lots had public sewer service available to them. . . . All that means to me, putting it all together, is again what I said to begin with. That the preponderance of the evidence is that there were

misrepresentations about the existence of the public sewer system to lot 25. . . .

There are other issues here. Particularly the fact that Mr. Joseph signed a form, . . . Confirmation of Agency Status, where he shows himself as designated agent for the buyer. And the form itself provides that, look, if you're the agent for the buyer, how can you be the agent for the buyer when you're actually a member of the seller. You're an owner. You're the seller. How can you be the seller and also act as an agent for the buyer. That's problematic. But in the Court's opinion, it also figures in to the calculus of where's the preponderance of the evidence about the misrepresentation and is this something that Mr. Hall, the Halls should have discovered in connection with this transaction. And I cannot hold that it is something that they should have discovered under the circumstances of this case such that it bars any relief from them in this case. . . . And then the confirmation of agency status, Mr. Joseph appears as agent for the buyer. Under all those circumstances, I cannot hold that the fact that the disclosure statement says no sewer service in fact bars the Halls from any recovery here.

In effect, the Court holds that Eagle Rock, LLC is liable for misrepresentation in this case. . . .

The court ordered against Eagle Rock that the contract be rescinded and that the Halls be refunded the purchase price of the property.

On the issue of attorney's fees, the court stated the following:

I hold with respect to Blue Ridge there was a[n] unfair deceptive act to practice under the TCPA because Mr. Joseph, among other things, Mr. Joseph, the seller, a member of the seller, Eagle Rock, also acted as in-house real estate agent and that was – that contributed to some extent the knowledge of Mr. Joseph as a member of Eagle Rock is attributable also to the real estate agency, Blue Ridge, and that therefore the [Halls] are entitled to their attorney's fees as against Blue Ridge.

The court entered an order awarding the Halls attorney's fees in the amount of $20,282.50. The defendants appeal.

## II.

The defendants present the following issues quoted verbatim from their brief:

> The trial court erred in finding that the Halls were entitled to rescind the agreement with Eagle Rock.
>
> The trial court erred in finding that the Halls were entitled to attorney's fees only against Blue Ridge Realty, Inc.

(Paragraph numbering in original omitted.)

## III.

When, as here, the trial court sits without a jury, we review the trial court's findings of fact in the record with a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We review a trial court's conclusions of law under a de novo standard with no presumption of correctness attaching to the trial court's legal conclusions. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

## IV.

### A.

The defendants assert that the Halls were not entitled to rescission of the contract. In their brief, they argue that

> despite multiple opportunities to discover the state of the installation of sewer utilities and whether the sewer utilities were operational, the Halls completely failed to do so both after signing the [a]greement and after closing on the [p]roperty. Over three years elapsed between the Halls' purchase of the [p]roperty and when they claim they first discovered the sewer system was not operational. The trial court erred in finding the Halls were entitled to rescission under these circumstances.

The defendants conclude that

> [t]here is absolutely no basis for rescission of this

[a]greement. First, Mr. Hall, through his own failure to read the documents and his own inattention to detail, did not learn until 3 years after he purchased the lot that the sewer system was not completely installed. The parties cannot be put in status quo, or if, due to the passage of time, equity cannot be done; there is no ground for rescission. That is precisely the situation here, and the trial court erred in granting rescission.

We disagree with the entity defendants' position.

The record before us demonstrates that the Halls were led to believe that public sewer would be provided to the lot they purchased, which was material to the transaction. It is disputed whether Ms. Knorr specifically told the Halls that a public sewer system was in the ground or that it would be installed and available to the lot. There is, however, no evidence that Ms. Knorr was forthcoming with the Halls about the fact that public sewer had not been installed and was contingent on any other factors, including funding. The record contains many representations that public sewer was either currently available or would be available for the lot they purchased.

The MLS brief for the lot the Halls purchased clearly indicated that sewer service was available to the lot. There are multiple listings of the property that specify that one of the features available for the lot is sewer. According to Mr. Hall's trial testimony, Ms. Knorr provided him with the MLS listing for the lot when she visited the property with him. In Ms. Knorr's deposition, she stated that she did not "recall giving specific, like handing something to him. But we do have a website that had the master information about . . . the development." Even if Ms. Knorr did not specifically provide Mr. Hall with the MLS listing, that does not change the fact that Mr. Hall had access to the listing and that the listing showed that the lot would have public sewage disposal. In addition to the listing for lot 25, the MLS briefs of numerous other lots in the development all indicate that the lots would have sewer available. These are clear representations that public sewer would be available for lot 25.

In the guidelines for the Preserve posted on the development's website, there is a clear representation that the lots in the Preserve would have sewer available. As quoted previously, the plain language of the guidelines speaks to the existence of public sewer service to each lot. There is no disclosure that the sewer service would be contingent on funding or the feasibility of installing the service. The guidelines clearly indicate that sewer service would be provided and that the only thing a lot owner would need to do would be to extend the lot to the stub location. These publicly available guidelines represent that there would be access to sewer for the lot.

Additionally, there was a sewer manhole in front of lot 25. While a sewer manhole alone may not be a representation that the lot would have sewer service, the

- 8 -

existence of this manhole in conjunction with the other representations in the record could lead a potential buyer to reasonably believe that lot 25 would have access to a public sewer system.

While the record is replete with representations that the property the Halls purchased had or would have sewer available, the only evidence that the lot would not have public sewer is the disclosure statement signed by the Halls on the day they executed the contract. This disclosure statement indicating the lot would not have public sewer, however, was signed by Mr. Joseph on March 15, 2006, some three months before the Halls signed on June 16, 2006. This disclosure statement was not presented to the Halls until the execution of the contract even though it was executed by the seller three months prior. Given that there were numerous representations that the lot would have sewer, the defendants should have expressly disclosed this information prior to the Halls' execution of the contract on lot 25. The fact that the Halls were given a disclosure statement when they executed the contract indicating that the lot would not have public sewer does not bar recovery for the Halls under the facts of this case.

According to the Halls, public sewer was material to the transaction. Mr. Hall testified that "public sewer . . . was a material component in the fact that . . . you wouldn't have restrictions on the number of bedrooms per lot." He asserted that "[i]f I had ever known that there was a two-bedroom septic for my lot or that they had decided to have an on-site sewage treatment plant directly down the road from my lot, I would have had some major concerns about smell, about the process." At trial, Mr. Hall claimed that he would not have bought the lot had he known that the lot would have a septic system and the development would have an on-site treatment facility rather than public sewer.

Based on the numerous representations to the Halls, the trial court held that "the preponderance of the evidence is that there were misrepresentations about the existence of the public sewer system to lot 25." Accordingly, the court ordered "that the contract be rescinded and that the [Halls] be refunded their purchase price." The preponderance of the evidence supports the trial court's decision in this case.

The Supreme Court has stated the following regarding the remedy of rescission when there have been misrepresentations by one of the contracting parties:

> A purchaser who has been the victim of a misrepresentation
> or who has been induced to contract through a mistake of
> material fact mutual to him and his vendor, is afforded by
> courts both of law and equity with a number of alternate
> remedies, including actions for rescission and restitution,
> actions for breach of contract and actions in tort for
> misrepresentation. All that the law requires of such a

- 9 -

> purchaser is that he elect consistently among the remedies available to him.

*Issacs v. Bokor,* 566 S.W.2d 532, 537 (Tenn. 1978) (Internal citations omitted.)

The Supreme Court has also explained that "[r]escission . . . involves the avoidance, or setting aside of a transaction. Usually it involves a refund of the purchase price or otherwise placing the parties in their prior status." *Mills v. Brown*, 568 S.W.2d 100, 102 (Tenn. 1978).

In this case, the Halls expressly sought to rescind the contract. There are clear misrepresentations in the record about the existence of a public sewer system for the property. The existence of the sewer system was material to the Halls in purchasing the property. As a victim of these misrepresentations, rescission is an appropriate remedy in this case. The evidence does not preponderate against the trial court's finding that there were misrepresentations about the existence of public sewer, and we affirm rescission of the contract entitling the Halls to a return of the $123,000 purchase price of lot 25 in the Preserve.

In evaluating the preponderance of the evidence on the issue of whether misrepresentations pertaining to the subject of public sewage disposal were made to the Halls, there is much in the record to support the trial court's finding that the matter was misrepresented to them. The volume of the evidence supporting the trial court's finding, much of which is in the form of documentary evidence, clearly shows that misrepresentations were made. The MLS brief for lot 25 that was available to the Halls prior to their purchase specifically states that one of the utilities available to lot 25 is public sewer. Furthermore, the MLS brief for many of the other lots in the development also states that the lots will have public sewer available. The development also published guidelines on its website that were available to the Halls. The guidelines specifically state that utility services "are stubbed to the front property line of each homesite." The description of utilities in the guidelines provides that sewer is clustered in a utility easement adjacent to each homesite. These publicly available guidelines clearly speak to the existence of sewer at each homesite. According to the guidelines, all a homeowner would need to do is to extend the line from the stub to the residence. In addition to these publicly available documents specifically speaking to public sewer at lot 25, there were sewer manholes existing on the development when Mr. Hall visited the property. The existence of sewer manholes throughout the development in addition to the documents stating that sewer was available clearly indicate that sewer utility service to each lot was going to be available. The Halls were not made aware of the fact that such was not the case during the time prior to the purchase of the property. When Mr. Hall visited the development, Ms. Knorr, the exclusive listing agent for the development, spent hours at the development with him. Rather than ensuring that Mr. Hall was aware of the real status of the sewer system, she failed to disclose the fact that public sewage disposal, in

fact, was not available at the time and in addition, was contingent upon factors such as feasibility and funding. Instead, Mr. Hall asserts that Ms. Knorr stated that public sewage disposal was available to lot 25. Additionally, despite the fact that lot 25 was restricted to a two-bedroom septic tank system, Mr. Hall was never made aware of that restriction prior to closing on the property on June 30, 2006. Mr. Joseph signed a document stating that lot 25 would not have public sewage disposal. Even though Mr. Joseph signed the disclosure statement in March 2006 prior to Mr. Hall visiting the development, neither Mr. Joseph nor Ms. Knorr made any effort to make the Halls aware that public sewage disposal would not be available. The overwhelming evidence in the record demonstrating that misrepresentations were made about the existence of public sewage disposal for lot 25 outweighs the provision in the disclosure statement that Mr. Joseph signed three months prior to the Halls executing the document. We hold that the evidence does not preponderate against the trial court's finding that misrepresentations were made to the Halls.

**B.**

The TCPA states the following with regard to awarding attorney's fees:

> Upon a finding by the court that a provision of this part has been violated, the court may award to the person bringing such action reasonable attorney's fees and costs.

Tenn. Code Ann. § 47-18-109(e)(1). The trial court found that the failure of Mr. Joseph to disclose to the Halls his relationship with the seller was a violation of the TCPA. Based on this finding, the court held as follows:

> [W]ith respect to Blue Ridge there was a unfair deceptive act to practice under the TCPA because Mr. Joseph, among other things, Mr. Joseph, the seller, a member of the seller, Eagle Rock, also acted as in-house real estate agent and that was – that contributed to some extent the knowledge of Mr. Joseph as a member of Eagle Rock is attributable also to the real estate agency, Blue Ridge, and that therefore the [Halls] are entitled to their attorney's fees as against Blue Ridge.

In *Fayne v. Vincent*, the Supreme Court held that "[w]hether a particular act is unfair or deceptive is a question of fact." 301 S.W.3d 162, 170 (Tenn. 2009). With regard to the purpose and reach of the TCPA, the Supreme Court has stated the following:

> The [TCPA], enacted in 1977, was passed, in part, to protect consumers from unfair and deceptive acts and practices

- 11 -

occurring "in the conduct of any trade or commerce" in the state and to provide a means "for maintaining ethical standards of dealing between persons engaged in business and the consuming public." The Act is to be liberally construed in order to enable it to protect the consumer and to promote the other policies which motivated its passage. . . .

. . . The Act covers the transfer of real property . . . .

*       *       *

In a transaction involving the sale of real property, the seller has a duty to disclose to the buyer material facts that affect the property's value and that are not known or reasonably discoverable by a purchaser exercising ordinary diligence. . . .

. . . [A] violation is judged by the likely effect on consumers rather than the intention of those making misrepresentations.

*Id*. at 172, 177−178 (Internal citations omitted).

In their brief, the entity defendants argue the following with regard to the award of attorney's fees against Blue Ridge:

The trial court failed to explain how the [contract] between the Halls and Eagle Rock would provide a basis to find BR Realty liable for attorney's fees only. BR Realty was not a party to the [contract] between the Halls and Eagle Rock. The [contract] was rescinded. Yet, the trial court awarded attorney's fees to the Halls against BR Realty only, and in doing so, the trial court's determination on this issue should be reversed.

We disagree. The trial court did not in fact award attorney's fees against Blue Ridge under the contract. The defendant's argument that the trial court erred in awarding attorney's fees against Blue Ridge, who was not a party to the contract, and under a contract that had been rescinded is misplaced. The trial court's judgment states "that [the Halls] are entitled to a judgment for attorney's fees only pursuant to the [TCPA] against Blue Ridge Realty, Inc. only." The defendants fail to demonstrate how attorney's fees against Blue Ridge are improper under the TCPA. The TCPA clearly authorizes an award of attorney's fees.

Here, the trial court found that Blue Ridge had violated the TCPA and awarded

attorney's fees pursuant to the statute. The evidence does not preponderate against the trial court's factual findings that Blue Ridge engaged in unfair deceptive acts in violation of the TCPA. First, the Supreme Court has specifically held that a seller of real estate has a duty to disclose material facts to the buyer affecting the value of the property. Here, Blue Ridge failed to disclose to the Halls that the property would not have public sewer and that there would be an onsite treatment facility. To the Halls, this affected the value of the property. Accordingly, this failure to disclose was deceptive and a violation of the TCPA.

Additionally, Tenn. Code. Ann. § 47-18-104(b)(3) makes the following an unfair or deceptive act or practice: "[c]ausing likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another." In this case, Mr. Joseph signed the confirmation of agency status as a member of the seller two months before the contract was signed by the Halls. This form also designated Joseph as the designated agent for the buyer. This is problematic because it does not appear that either the fact that Joseph was a member of the seller or that he would be acting as the designated agent for the Halls was disclosed to them. If these facts had been disclosed, it might have caused the Halls to retain their own representation and make further investigations into the status of the property. At trial, Mr. Hall testified that he did not consider Mr. Joseph his agent, that he never met with him regarding that relationship, that he never received a written agency agreement, that he never received a disclosure statement stating that his designated agent had an ownership interest in the property, and that Mr. Joseph's agency status and affiliation with the seller was never discussed with him prior to the closing. It is clear that Mr. Joseph, acting as the seller, failed to adequately disclose his affiliation with the seller. This could cause likelihood of confusion or a misunderstanding as to Joseph's affiliation with the seller. Thus, this lack of disclosure constitutes a deceptive act, as defined by the TCPA.

Because the TCPA allows an award of attorney's fees against a party violating the act, the trial court did not err in awarding attorney's fees to the Halls against Blue Ridge after finding that Blue Ridge had violated the TCPA. We hold that the evidence does not preponderate against the trial court's finding that the Halls are entitled to their attorney's fees from Blue Ridge under the TCPA.

## V.

The judgment of the trial court is affirmed. The costs on appeal are assessed to the appellants, Eagle Rock Development, LLC and Blue Ridge Realty, Inc. This case is remanded for enforcement of the trial court's judgment and for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE

- 13 -